**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kellye Evans,<br><br>    Plaintiff,<br><br>v.<br><br>Scribe One Limited LLC, et al.,<br><br>    Defendants. | No. CV-19-04339-PHX-DLR<br><br>**ORDER** |

At issue is Plaintiff Kellye Evans' motion for a preliminary injunction (Doc. 23), which is fully briefed (Docs. 26, 35, 52). The Court held an evidentiary hearing on August 12, 2019, and thereafter took the matter under advisement. For the following reasons, the Court denies Evans' motion.

**I. Background**

This case presents a dispute over the ownership of a medical scribe[1] company called Scribe One, LLC. Evans claims that she is the sole owner of Scribe One, that Defendants Bruce Tizes and Sydney Stern are unlawfully holding themselves out as Scribe One's owners, and that Tizes and Stern have taken actions to undermine Evans' ability to effectively operate the business.[2]

---

[1] A medical scribe is a person who accompanies health care workers during patient interactions and writes down or types relevant information into the patient's electronic health record.

[2] Evans names Scribe One as a nominal defendant for the sole purpose of placing it into a receivership pending resolution of these ownership issues. Evans otherwise asserts

**A. Evans' Allegations**[3]

Evans alleges that she formed Evans Consulting, LLC, a medical consulting company, in 2016 and served as its sole owner and member. In January 2017, Evans Consulting contracted with the San Carlos Apache Healthcare Corporation ("SCAHC") to provide consulting services to its hospital. Eventually, the contract evolved into one in which Evans Consulting provided medical scribe services directly to SCAHC. To fulfil these obligations, Evans Consulting hired approximately fifteen medical scribes, trained and supervised by Evans.

In March 2017, Evans met Tizes, an emergency medicine physician and entrepreneur. In June 2017, Evans and Tizes orally agreed to form Scribe One ("the Formation Agreement"). The terms of the Formation Agreement were as follows: Evans would have a 70% ownership interest in Scribe One; Evans would transfer ownership of Evans Consulting to Scribe One so that Scribe One would have the benefit of the SCAHC contract; Evans would manage and oversee all of Scribe One's operations; beginning September 2017, Scribe One would pay Evans a salary and provide her with other employee benefits, in addition to her equity interest in the company; Tizes would have a 30% ownership interest in Scribe One, contingent upon him making a payment to Evans equal to 30% of the gross revenues that Scribe One would generate between July 1, 2017 and December 31, 2018 ("the Buy-In Payment"); Tizes would make the Buy-In-Payment no later than eighteen months after formation of Scribe One; Tizes would provide operational assistance to Scribe One on a part-time basis so that he could continue working full-time as a physician; and Tizes would file the necessary paperwork with the Delaware Division of Corporations to form Scribe One, obtain the domain "ScribeOne.com," and setup the company's website and email accounts. The parties did not discuss or agree that Tizes would receive a salary.

---

no substantive claims against Scribe One. The Court previously determined that the evidence does not warrant the appointment of a receiver. (Doc. 67 at 160.) Accordingly, for purposes of this order the Court does not consider Scribe One to be a party in any meaningful sense.

[3] The following information derives from Evans' verified complaint. (Doc. 1-3 at 6-24.)

On June 27, 2017, Evans signed a document prepared by Tizes transferring ownership of Evans Consulting to Scribe One. Two days later, Tizes formed Scribe One as a Delaware limited liability company. Unbeknownst to Evans, however, Tizes formed the new company with Stern as the sole and managing member. Had Evans known that Stern would be designated as Scribe One's sole owner and member, she would not have transferred Evans Consulting to the new company. Evans learned that Stern was designated as Scribe One's sole owner and member in October 2017, when either Tizes or Stern filed an application to register a foreign limited liability company with the Arizona Corporation Commission ("ACC"). The application identified Stern as Scribe One's only member. Thereafter, Evans repeatedly requested that Tizes and Stern correct the filings, to no avail.

On July 1, 2017, Scribe One took control of Evans Consulting. All Evans Consulting employees became Scribe One employees, and Evans began transferring all revenue collected under the SCAHC contract to a Scribe One bank account. Evans has since sought and procured new contracts, and recruited, hired, trained, and supervised new employees, all on behalf of Scribe One.

At some point, Tizes refused to provide Evans with administrative privileges and control over many systems required for her to run the business. Instead, Stern increasingly performed those administrative functions.

Beginning in October 2017, Tizes began collecting from Scribe One a monthly salary and health benefits. In October 2018, two months before he was to make the Buy-In Payment, Tizes informed Evans that he no longer wanted to participate in Scribe One and suggested that Evans buy him out. He also stopped performing work for Scribe One, although he continued to collect salary and benefits. As a result, Evans had to rely on Stern for administrative access and support. Between October and December 2018, Tizes repeatedly promised to meet with Evans to resolve their business dispute but failed to do so.

Eventually, in January 2019, Evans met with Tizes, who suggested that Evans give

him an even larger share of Scribe One so that he could take the company public. Evans rejected Tizes offer, noting that he had not fulfilled his obligations under the Formation Agreement by making the Buy-In Payment and correcting corporate filings to reflect Evans as Scribe One's owner.

By February 2019, Tizes and Stern had ceased all communications with Evans, leaving Evans without the administrative access needed to effectively run the company. Evans fears that her own reputation and Scribe One's business operations will be irreparable damaged if she is unable to manage the company.

### B. The Preliminary Injunction Hearing

The Court summarizes below the material testimony from the three main players in this story: Evans, Stern, and Tizes. Evans called two additional witnesses, Theresa Delarm and William Jones, but the testimony from these witnesses does not materially affect the Court's analysis.

#### i. Evans' Testimony

In 2017, Evans met Tizes and the two discussed forming Scribe One. Per their discussions, Evans would transfer Evans Consulting and its associated contracts and profits to Scribe One and own 70% of the new company; Tizes would own 30% of the new company and make the Buy-In Payment eighteen months later. In June or July 2017, Tizes drafted a document that both transferred Evans Consulting to Scribe One and detailed the terms of Scribe One's formation, but Evans lost this document. Evans cannot recall whether Tizes signed this document.

In July 2017, Evans told Evans Consulting employees that the company was rebranding as Scribe One. Starting in July 2017, Evans began transferring money from the SCAHC contract to Scribe One. She eventually transferred all Evans Consulting employees and proprietary materials to Scribe One and began hiring new employees and procuring new contracts for Scribe One. For example, Evans procured contracts with Banner University Medical Center and Barrow Neurological Institute on behalf of Scribe

One, which would have gone to Evans Consulting had Scribe One not been created.[4]

Since its inception, Evans has held herself out as Scribe One's owner, but her name was purposefully left off Scribe One's incorporation documents. Evans previously worked for a different scribe company in Texas, with which she had a non-compete agreement. Although she believed this non-compete agreement was unenforceable, Tizes had recommended that Evans' name be left off the incorporation documents out of caution. Evans believed that Tizes would incorporate Scribe One under his own name and add Evans as an owner after her non-compete agreement expired. Instead, Scribe One's incorporation documents identified Stern as its owner and sole member. In addition, Stern took out an insurance policy for Scribe One, opened its bank account, and applied for its Employer Identification Number ("EIN"). Evans learned that Stern was identified as Scribe One's owner in October 2017, when Stern applied to register Scribe One as a foreign limited liability company with the ACC. Tizes told Evans that Stern formed the company because he was more comfortable if both their names were added to the company's incorporation documents at the same time after Evans' non-compete agreement expired. Tizes said he would correct the incorporation documents at the appropriate time, but he never did.

In October 2018, Tizes told Evans that he no longer wanted to be involved with Scribe One and asked her to buy him out. Later, he asked for an even larger share of Scribe One so that he could take the company public. Evans declined these offers, noting that Tizes had not upheld his end of the Formation Agreement.

Evans seeks a preliminary injunction because she is worried about potential damage to Scribe One and, by extension, to her own reputation. Scribe One has lost at least one contract because of the uncertainty caused by the dispute between Evans, Tizes, and Stern, and Evans is experiencing difficulties negotiating other contracts for the company. Thus

---

[4] Evans, however, remains the owner of Evans Consulting according to ACC records. She has not filed any paperwork with the ACC to reflect a change in ownership because she assumed Tizes did it. Curiously, Evans continues to negotiate an extension of the SCAHC contract on behalf of Evans Consulting, not Scribe One.

- 5 -

far, however, Scribe One's bills have been paid and the company continues to operate.

### ii. Stern's Testimony

Stern testified that she is the sole owner of Scribe One and provides administrative and operational services for the company. Stern has not taken money out of Scribe One except to pay legal fees associated with this action. Stern incorporated Scribe One, took out an insurance policy for it, opened its bank account, and applied for its EIN. Stern also secures Scribe One's credit card. Stern executed a written operating agreement, prepared by Tizes, that identified herself as Scribe One's sole owner. This original agreement is lost. Stern, however, has a copy of a revised operating agreement created and executed after Scribe One's initial formation that reflects her ownership.

Tizes is Scribe One's medical director and chief executive officer ("CEO"), and sometimes is involved in procuring new contracts. He takes a salary but is not presently an owner. Tizes retains an option to purchase an ownership interest in Scribe One. Evans works largely in a training and sales capacity, convincing doctors that scribing services are desirable. Stern never agreed to give Evans an equity interest in the company. Tizes prepared written employment agreements for himself and Evans, but these written agreements are lost.

Evans Consulting remains Evans' separate company, and the SCAHC contract belongs to Evans Consulting. Evans Consulting and Scribe One have a leaseback agreement, under which Scribe One "owns" the scribes that service the SCAHC contract and leases them back to Evans Consulting. Money from the SCAHC contract goes into a designated bank account to reimburse Scribe One for the costs associated with the scribing services (such as payroll). Whatever money remains from the SCAHC contract after covering costs, however, belongs to Evans Consulting and, by extension, to Evans. This leaseback agreement is not in writing.

Stern testified to what she perceived to be suspicious activity by Evans. For example, Evans began working for Scribe One for an annual salary of $75,000, but at some point unilaterally increased her salary to $150,000. Stern also claims that Evans is

withholding a check from SCAHC to pay for scribe services. As a result, Evans no longer has access to Scribe One's credit card, but retains access to Scribe One's debit card. Similarly, Evans retains the ability to access her own email account but cannot access other Scribe One email accounts. According to Stern, Scribe One could continue functioning without Evans.

### iii. Tizes' Testimony

Tizes met Evans in February 2017 and the two discussed forming Scribe One. Under their proposed division of labor, Tizes would manage big-picture business strategy, Stern would manage day-to-day business operations, and Evans would train new scribes and sell Scribe One's services. Tizes knew that Evans had a separate business contracting with SCAHC, and they discussed the possibility of Scribe One acquiring Evans Consulting. Ultimately, however, Scribe One did not acquire Evans Consulting, at least in part because of concerns about the latter's valuation. Likewise, there were discussions about Evans acquiring an ownership interest in Scribe One but an agreement was never reached.

Tizes has variably described his role with Scribe One as medical director, CEO, and president. He draws a salary and health benefits but is not currently an owner of the company. Tizes was never interested in running the day-to-day operations of Scribe One and, instead, wanted Stern to provide those services. As a new start-up, however, Scribe One lacked the funds to pay Stern a salary. Instead, Scribe One was incorporated with Stern as its sole owner, and Tizes retained an option to buy in to the company later.

Evans still owns Evans Consulting, which continues to own the SCAHC contract. Beginning in July 2017, Scribe One has had an unwritten agreement with Evans Consulting under which Scribe One provides Evans Consulting with scribes and operational support, such as administration, billing, collections, and management. Evans previously struggled with managing the administrative aspects of Evans Consulting. This agreement essentially allows Evans Consulting to outsource those responsibilities to Scribe One. Evans Consulting reimburses Scribe One for costs, but keeps whatever money remains. Evans Consulting has discretion to deposit with Scribe One only enough money to cover costs, or

to deposit all revenue from the SCAHC contract. In either case, however, Evans Consulting is entitled to whatever money remains from the SCAHC contract after reimbursing Scribe One. Although Evans owns Evans Consulting, the scribes Evans Consulting uses to fulfil the SCAHC contract belong to Scribe One and have signed non-compete agreements. Accordingly, Evans cannot employ those scribes directly.

### C. Subsequent Developments

Injunctions need to be precise. The Court cannot vaguely order Defendants not to interfere with Evans' ability to operate the business, especially when the parties disagree on what constitutes normal business operations. Accordingly, at the end of the preliminary injunction hearing, the Court asked Evans to itemize the specific actions she wants the Court to enjoin. Evans identified five discrete matters: (1) access to a Scribe One debit card; (2) limits on Defendants' ability to spend Scribe One funds, including to pay their legal fees in this matter; (3) timely responses from Defendants regarding new hires and contracts, or authority for Evans to enter into contracts and hire new scribes without Defendants' approval; (4) access to the Scribe One Google Suit; and (5) a prohibition on terminating Evans' employment during the pendency of this case.

After a discussion of these issues, the parties reached a tentative agreement on most, but not all, of the matters Evans had identified. The Court ordered the parties to confer and memorialize their agreement in a written stipulation for the Court's review and approval. The parties did so, and on August 29, 2019, the Court entered an order on the parties' stipulation. (Doc. 73.) The order: (1) granted Evans access to a Scribe One debit card in her name for company use during the time she is employed by the company; (2) set terms for Evans' access to the Scribe One Google Suite, and for Defendants to timely respond to Evans' requests, during the time Evans is employed at the company; (3) granted Evans access to the Scribe One Docusign account password for the company's contracts and other documents; (4) prohibited Scribe One from making distributions to Stern during the pendency of this case; and (5) if Scribe One decided to terminate Evans' employment, required Scribe One to give Evans and the Court a one-week notice before the effective

date of the termination, along with the reasons for the termination. (Doc. 73.)

On November 14, 2019, Defendants' filed a notice informing the Court that the intended to terminate Evans' employment with Scribe One effective November 21, 2019. (Doc. 96.) In a statement responding to this notice, Evans attached a letter from Defendants' counsel indicating that, in addition to terminating Evans' employment, Scribe One intended to terminate "any and all services relative to the [SCAHC] site, effective immediately." (Doc. 98-1.) Evans contends that termination of these services would irreparably harm Evans Consulting because Scribe One's scribes work for Scribe One under non-compete agreements, and Evans Consulting cannot employ them directly. Consequently, if Scribe One terminates its unwritten leaseback arrangement with Evans Consulting, the latter will be unable to fulfil its obligations to SCAHC. (Doc. 98 at 2-3.) Evans Consulting, however, is not and has never been a plaintiff in this action. Evans instead has taken the position that Evans Consulting was absorbed by Scribe One and no longer exists as a separate entity.[5]

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). These elements may be balanced on a sliding scale, whereby a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131, 1134–35 (9th Cir. 2011). But the sliding-scale approach does not relieve the movant of the burden to satisfy all four prongs for the issuance of a preliminary

---

[5] On November 19, 2019, Evans filed a motion for leave to amend her complaint. (Doc. 101.) Her proposed amended pleading would add Evans Consulting as a plaintiff and plead theories premised on Evans Consulting existing a separate company. The Court will address Evans' motion for leave to amend in due course after it is fully briefed. This order, however, addresses Evans' preliminary injunction motion on its existing terms, based on the operative complaint and the theories advanced during the preliminary injunction hearing. The Court cannot be expected to hit a moving target.

injunction. *Id.* at 1135. Instead, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The movant bears the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

**III. Analysis**

The gravamen of Evans' preliminary injunction motion is that she is Scribe One's sole and lawful owner, and the company will suffer irreparable damage unless the Court enjoins Stern and Tizes from expending Scribe One funds and interfering with Evans' ability to operate the business. Evans' motion is denied because she has shown neither a likelihood of success on the merits of this theory, nor a likelihood of irreparable harm.

**A. Merits**

The most glaring defect in Evans' case is the lack of a written agreement evidencing her ownership interest in Scribe One. To the contrary, Scribe One's incorporation documents identify Stern as Scribe One's owner, as does the only written operating agreement in evidence. (Exh. 208.) There also is circumstantial evidence indicating that Stern owns the company. For example, Stern took out an insurance policy on behalf of Scribe One, opened Scribe One's bank account, and applied for Scribe One's EIN. Evans also knew that Scribe One's incorporation documents identified Stern as the company's owner as early as October 2017, yet continued to work for company for over a year before filing this action.

Evans' claim instead is based on an alleged oral agreement between her and Tizes. But under Delaware and Arizona law, the statute of frauds bars enforcement of an agreement that cannot be performed within the one year of its making unless it is written and signed by the party against whom the contract is to be enforced. 6 Del. C. § 2714(a); Ariz. § 44-101(5). According to Evans, the Formation Agreement was contingent upon Tizes making a Buy-In Payment equal to 30% of gross revenues generated by Scribe One

over an eighteen-month period. It would have been impossible for Tizes to perform his end of the bargain within one year because he could not calculate the Buy-In Payment within that time period. Neither party produced a written version of this alleged agreement. And although Evans testified that a written agreement at one point existed, she could not recall whether Tizes signed it. Accordingly, the Formation Agreement likely is unenforceable as a matter of law.

Evans tries to avoid the statute of frauds by relying on three exceptions to its application: (1) part performance by the party invoking the statute of frauds, (2) promissory estoppel and (3) equitable estoppel. Her reliance is on these exceptions is misguided.

The part-performance exception "is grounded in the equitable principle of estoppel." *Owens v. M.E. Schepp Ltd. P'ship*, 182 P.3d 664, 668 (Ariz. 2008). Evans' first and third arguments therefore share commonalities. The part-performance exception applies only when the acts of part performance "cannot be explained in the absence of the contract." *Id.* "If the alleged acts do not conclusively establish that a contract exists, reliance upon them would circumvent the evidentiary function of the statute." *Id.* at 669. Similarly, "[e]quitable estoppel generally applies where (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) the other party relies on those acts; and (3) the latter party is injured by the former's repudiation of its prior conduct." *City of Tucson v. Clear Channel Outdoor, Inc.*, 181 P.3d 219, 237 (Ariz. App. 2008) (quotation and citation omitted).

Here, Tizes' alleged acts of part performance do not conclusively establish the existence of the Formation Agreement because they can be explained in other ways. Indeed, Tizes' and Stern's testimony establish this alternative explanation: Stern owns Scribe One, Tizes takes a salary and has an option to purchase an equity interest in the company, Evans works as an employee of Scribe One, and Evans Consulting contracts with Scribe One for the provision of scribes and other administrative services at cost. The part-performance exception therefore does not apply. Moreover, for these same reasons, Evans has not shown that Tizes and Stern are currently taking a position inconsistent with their

prior conduct for purposes of equitable estoppel.

Next, Evans correctly notes that "the statute of frauds does not apply in cases of promissory estoppel when the party asserting the statute of frauds defense has misrepresented that the statute's requirements have been met or promises to put the agreement in writing." *Diaz-Amador v. Wells Fargo Home Mortgages*, 856 F. Supp. 2d 1074, 1080 (D. Ariz. 2012). Evans' verified complaint, however, does not assert a promissory estoppel claim, and she cannot amend her complaint through a reply in support of her preliminary injunction motion.[6] Regardless, Evans has not proffered evidence that Tizes misrepresented that the statute's requirements had been met or promised to put the Formation Agreement in writing. To the contrary, Evans testified that the parties did, in fact, put the Formation Agreement in writing, but subsequently lost it.

Aside from the statute of frauds, Evans' claim to ownership is undermined by evidence that she failed to consummate a condition precedent to the alleged Formation Agreement—the transfer of Evans Consulting to Scribe One. Evans has not proffered sufficient evidence that this condition occurred. Evans testified that she signed a document that, if filed with the ACC, would have effectuated this transfer. But, as with every critical document in this case, no party could produce a copy of this transfer agreement, and ACC records continue to identify Evans Consulting as a separate company in good standing with Evans as its sole owner and member. Moreover, both Tizes and Stern testified that Evans Consulting remains Evans' separate company, and that it continues to own the SCAHC contract. Circumstantial evidence supports Tizes' and Stern's testimony on this matter. For example, Evans Consulting still maintains a separate bank account and Evans herself testified that she continues to negotiate an extension of the SCAHC contract for Evans Consulting, not Scribe One. Accordingly, to the extent the Formation Agreement required Evans to transfer ownership of Evans Consulting to Scribe One, there is insufficient evidence that Evans performed this condition precedent.

---

[6] Evans' citation to *Diaz-Amador* is self-defeating, as the plaintiff in that case likewise failed to plead a promissory estoppel claim, and the court's discussion of the statute of frauds therefore was "relevant as to whether Plaintiffs should be permitted to amend the complaint." 856 F. Supp. 2d at 1081.

Lastly, Evans' claim to ownership also is undermined but several inconsistencies between the allegations she made in her verified complaint and the testimony she gave during the preliminary injunction hearing. For example, Evans testified during the preliminary injunction hearing that, at the time of Scribe One's formation, she was purposefully left off the incorporation documents because she was subject to a non-compete agreement with another scribe company in Texas. Yet her verified complaint fails to mention a non-compete agreement or that she was purposefully left off Scribe One's incorporation documents. To the contrary, Evans' verified complaint left the Court with the impression that Evans expected to be identified as Scribe One's owner immediately upon incorporation.

Further, Evans testified during the preliminary injunction hearing that she and Tizes memorialized the Formation Agreement in writing, but the document subsequently was lost. Her verified complaint, however, fails to mention this allegedly lost document.[7] Likewise, Evans verified complaint alleges that she transferred Evans Consulting to Scribe One, but during the preliminary injunction hearing she acknowledged that ACC records continue to identify Evans Consulting as a separate company in good standing with Evans as it owner, and even admitted that she continues to negotiate an extension of the SCAHC contract for Evans Consulting. If Evans genuinely believed that she no longer owned Evans Consulting, or that Evans Consulting was absorbed by Scribe One, it is difficult to comprehend why she still would be negotiating contracts on its behalf. Evans' claim to ownership principally relies on her own testimony about Scribe One's formation, but inconsistencies such as these cast doubt on her version of events.

For these reasons, Evans is unlikely to succeed on her claims to the extent they are premised on the theory that she transferred ownership of Evans Consulting to Scribe One, or that she owns Scribe One.

**B. Irreparable Harm**

---

[7] The verified complaint claims that Evans signed a document transferring ownership of Evans Consulting, but nowhere does it allege that she and Tizes memorialized the terms of the Formation Agreement in writing.

At the outset, there is fatal incongruity between the parties to this case and the irreparable harm Evans claims will occur in the absence of preliminary injunctive relief. Evans' preliminary injunction motion is based primarily on alleged harms that will befall Scribe One if Tizes and Stern are not enjoined from interfering with Evans' ability to operate the business. But Scribe One is not and has never been a plaintiff. Scribe One has only ever been a defendant, and a nominal one at that. Evans is the plaintiff and the party seeking preliminary injunctive relief. She therefore must demonstrate that she personally will be irreparable harmed without the preliminary injunction she seeks. But Evans has not proffered sufficient evidence of such harm. She merely complains, vaguely, of potential harm to her reputation if Scribe One begins to experience problems. This theory of reputational harm is intertwined with the merits because it presupposes that Evans owns Scribe One and, therefore, that reputational harm to Scribe One will be imputed to her. But Evans is unlikely to prevail on her claim that she owns Scribe One.

Moreover, even assuming that harm to Scribe One can be imputed to Evans, there is insufficient evidence that Scribe One will be irreparably damaged in the absence of the preliminary injunctive relief Evans seeks. Evans largely speculates that, unless she is helming Scribe One's day-to-day operations and unless Tizes and Stern are restrained from expending company money, Scribe One will be unable to satisfactorily serve its clients and employees and be on the road to ruin. Evans has proffered little evidence to show that this parade of horribles will come to pass. Perhaps the best evidence Evans produced during the preliminary injunction hearing was that Scribe One had lost at least one contract because the hospital at issue felt uncomfortable doing business with the company while Evans, Tizes, and Stern were quarreling over its ownership. But Evans, Tizes, and Stern will continue to dispute the company's ownership regardless of whether the Court orders the specific injunctive relief Evans seeks.

Finally, Evans has known since at least October 2017 that Scribe One's incorporation documents identified Stern as the company's owner. Evans claims that she repeatedly asked Tizes and Stern to correct these documents to no avail. Yet Evans

continued to work for Scribe One for over a year and waited until May 2019 to file this action. Her delay in pursuing her ownership claims undermines her allegations of irreparable harm. *See Gowan Co., LLC v. Aceto Agr. Chemicals*, No. CV-09-1124-PHX-JAT, 2009 WL 2028387, at *4 (D. Ariz. July 10, 2009) (noting that "delay in seeking legal remedy undermines the imminence of . . . irreparable harm").

Evans therefore has not carried her burden of demonstrating irreparable harm in the absence of a preliminary injunction.

## IV. Conclusion

Evans' verified complaint and preliminary injunction motion are premised on the theory that she transferred ownership of Evans Consulting to Scribe One, that she is the sole and lawful owner of Scribe One, and that Scribe One will be irreparable damaged if Evans does not helm its day-to-day operations. The evidence proffered during the preliminary injunction hearing, however, largely dispels the notion that Evans Consulting was absorbed by Scribe One, and the oral Formation Agreement upon which Evans bases her claim that she owns Scribe One likely is unenforceable under the statute of frauds. Moreover, Evans' theory of irreparable harm is based on speculative damage to Scribe One, but Scribe One is not the plaintiff in this action. For these reasons,

**IT IS ORDERED** that Evans' motion for a preliminary injunction (Doc. 23) is **DENIED**.

Dated this 19th day of November, 2019.

Douglas L. Rayes
United States District Judge

- 15 -